IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| BRENDA S. PROCTOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-6132-CV-SJ-REL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Brenda S. Proctor seeks review of the final decision of the Commissioner of Social Security denying plaintiff's two applications: an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq. (Tr. 95-97), and an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. (Tr. 27). Plaintiff argues that the ALJ (1) failed to properly evaluate plaintiff's credibility, (2) failed to properly weigh treating physicians' opinions in deciding the case, and (3) relied upon flawed vocational expert testimony that failed to take into account the opinions of plaintiff's treating physicians. I find that the ALJ did not err as alleged. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I. BACKGROUND

On May 28, 2004, plaintiff applied for disability alleging that she has been disabled since August 1, 2002. Plaintiff's disability stems from lower back impairment, osteoarthritis, bi-polar disorder, depression, cardiovascular disease, hypertension, and heel spurs. Plaintiff's applications were denied. On April 2, 2007, a hearing was held before the Honorable Linda L. Sybrant, Administrative Law Judge (ALJ). On June 1, 2007, the ALJ found that plaintiff was not under a

"disability" as defined in the Act. On August 18, 2009, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely

because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff, medical expert Hershel Goren, M.D., and vocational expert Lesa Keen, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

**1.  Earnings Statement**

Plaintiff's earnings statement reflects the following income for the years indicated:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1972 | $  156.80 | 1990 | $  1,240.00 |
| 1973 | 794.40 | 1991 | 795.38 |
| 1974 | 563.20 | 1992 | 1,119.91 |
| 1975 | 0.00 | 1993 | 0.00 |
| 1976 | 0.00 | 1994 | 929.25 |
| 1977 | 0.00 | 1995 | 6,295.43 |
| 1978 | 0.00 | 1996 | 6,844.25 |
| 1979 | 0.00 | 1997 | 8,929.31 |
| 1980 | 103.00 | 1998 | 11,896.56 |

| | | | |
|---|---|---|---|
| 1981 | 0.00 | 1999 | 11,768.36 |
| 1982 | 0.00 | 2000 | 12,012.95 |
| 1983 | 0.00 | 2001 | 9,696.46 |
| 1984 | 0.00 | 2002 | 4,671.11 |
| 1985 | 973.84 | 2003 | 0.00 |
| 1986 | 3,784.50 | 2004 | 0.00 |
| 1987 | 1,199.79 | 2005 | 0.00 |
| 1988 | 0.00 | 2006 | 0.00 |
| 1989 | 0.00 | | |

(Tr. 67.)

**2.      Work Activity Report**

On July 26, 2003, plaintiff completed a work activity report (Tr. 103-108). In that report, plaintiff reported that she had worked for Wal-Mart in Bentonville, Arkansas for $6.50 an hour for 40 hours per week, from July 1, 2001, until July 15, 2002, and that she left the work because of her medical condition (Tr. 104).

**3.      Disability Report**

On July 24, 2003, an agency employee contacted plaintiff about her applications (Tr. 111-113). In that report, plaintiff claimed an alleged onset date of July 15, 2002 (Tr. 111).

**4.      Disability Report**

On July 26, 2003, plaintiff completed a disability report in which she represented that she was 5'4" tall and weighed 260 pounds (Tr. 114). Plaintiff listed her medical conditions as including bipolar, depression, heel spurs, muscle spasms, hypertension, bursitis, and breathing problems (Tr. 114). When describing how these illnesses affected her ability to work, plaintiff said:

> Can't stand to be around people. I get nervous. I catch myself snapping at people. I'm always afraid I will do or say something wrong when that happens.

(Tr. 114.)

Plaintiff said that she continued to work after the date of her illness with no reduction of hours or change in job duties (Tr. 115). Plaintiff explained:

> I quit working at Wal-Mart because my feet swelled & my hand & arms hurt so badly I could hardly move. I didn't like snapping at people.

(Tr. 115).

Plaintiff indicated that she received her GED in December 1999 (Tr. 119-120).

**5.     Function Report**

On July 18, 2004, plaintiff completed a function report (Tr. 145-153). In the section on daily activities, plaintiff stated that she gets up and gets dressed in the morning, goes to the kitchen and makes coffee, wakes her handicapped daughter and gets her dressed and makes her breakfast, picks up the living room and vacuums, does laundry, fixes lunch for herself and her daughter, watches television in the afternoon, fixes dinner and cleans the dishes from the day, watches television until 9:00 p.m. or 10:00 p.m., and then goes to bed (Tr. 145).

Plaintiff represented that she drives a car, does the shopping about once or twice a week from between an hour to an hour and a half, and handles her money and pays her bills (Tr. 148). Plaintiff indicated that she sees her grandchildren three to four times a month (Tr. 149). Plaintiff indicated that she does not need to be reminded to go places, and she attends her medical appointments and does not require anyone to accompany her (Tr. 149).

Plaintiff stated that she does not have a problem with authority figures; she has never been fired from a job for problems getting along with others (Tr. 151). Plaintiff also stated that she does not handle stress or changes in her daily routine very well (Tr. 151).

## 6. Function Report, Adult - Third Party

On July 19, 2004, plaintiff's daughter, Yolanda Erickson, completed a function report on her mother (Tr. 154-162). In the report, Ms. Erickson disclosed that she currently spends eight hours a day with plaintiff because they live together (Tr. 154). As to daily activities, Ms. Erickson indicated that plaintiff sits on the couch, walks to and from the kitchen, does light housework, attends doctor appointments once or twice a week, and takes care of Ms. Erickson's disabled sister (Tr. 154). Ms. Erickson also indicated that plaintiff occasionally watches Ms. Erickson's children when she is at work (Tr. 155).

Ms. Erickson stated that plaintiff cannot be on her feet more than 20 minutes because she has bladder-control problems requiring frequent trips to the bathroom (Tr. 155). Ms. Erickson also reported that plaintiff has nightmares and muscle cramps (Tr. 155).

According to Ms. Erickson, plaintiff's illnesses do not prevent her from dressing, bathing, caring for her hair, shaving, feeding herself, or any other personal care activities; however, they do present problems with plaintiff getting to the bathroom in time (Tr. 155). Ms. Erickson reported that plaintiff prepares meals, does laundry, and picks up clutter around the house, although these activities are limited daily to one chore for thirty minutes (Tr. 156). Ms. Erickson indicated that plaintiff goes outside two or three times per week (Tr. 157); and when she goes shopping, it is only twice a month and she lasts only about 20 minutes before she needs a rest (Tr. 157).

Although plaintiff drives, Ms. Erickson thought plaintiff does not perform very well because she "tends to space off" (Tr. 157).

Ms. Erickson indicated that plaintiff takes care of the money and pays her bills (Tr. 157).

In the remarks section, Ms. Erickson wrote in part:

> My mother used to be very outgoing and always worked. You would always see her baking or sewing. She used to play with my children when they were little. She has lost the ability to go to the places she used to love. She has lost her independence and drive to do things on her own. I know it bothers her not to do the little things like baking cookies and carrying the laundry. She probably should not be driving anymore. Her judgement is very clouded.

(Tr. 161).

## B. SUMMARY OF MEDICAL RECORDS

Plaintiff's alleged disability onset date was initially reported as July 15, 2002, and then changed at the administrative hearing to August 1, 2002 (Tr. 111, 632).

On August 29, 2002, plaintiff completed a medical examination when she applied for a permit to operate a school bus (Tr. 324-324A). Plaintiff reported no significant past conditions or existing conditions (Tr. 324). A medical examination revealed no physical abnormalities (Tr. 325-326). The medical examiner certified that plaintiff was "physically qualified to safely operate a school bus" (Tr. 324).

On February 5, 2003, plaintiff went to Chris Sandberg, M.D., for a pap smear and checkup (Tr. 211, 213, 264-266). Plaintiff reported feeling depressed (Tr. 211).

On March 6, 2003, plaintiff saw Dr. Sandberg for a cough, fever, and an earache (Tr. 210). Plaintiff completed a questionnaire wherein she reported positive responses for mood disorder and

anxiety disorder (Tr. 208). Dr. Sandberg assessed plaintiff as having nasopharyngitis[1] and depression (Tr. 210). Dr. Sandberg noted that plaintiff was "doing okay" with her anti-depressant medication, which was "working" (Tr. 210, 263).

On April 16, 2003, plaintiff fell and injured her right arm and hip while taking out trash, and was seen at the emergency room at Heartland Hospital (Tr. 236-237, 358). X-rays of the right wrist, elbow, and shoulder were negative (Tr. 237, 360-62). The treating physician diagnosed her with right arm and leg sprains (Tr. 237, 359). Plaintiff was prescribed anti-inflammatory medication and advised to rest, and ice and elevate her arm (Tr. 237, 359).

On May 7, 2003, plaintiff saw Dr. Sandberg about her earlier fall (Tr. 260). Plaintiff reported continued depression and problems sleeping (Tr. 260). The doctor prescribed Zyprexa (an anti-psychotic drug used for bipolar disease) (Tr. 260).

On June 9, 2003, plaintiff told Dr. Sandberg that she was "feeling better" after her accident (Tr. 204, 257).

On July 10, 2003, plaintiff saw Dr. Sandberg about her cough and congestion, and complained of shortness of breath off and on, but was worse lately (Tr. 255). Plaintiff reported sleeping about five hours a night and she requested stronger medication. Plaintiff complained of leg and back pain. On examination, the doctor noted thigh tenderness, some discomfort with straight leg raising, and palpable muscle spasm in the lumbar paravertebral area. The doctor diagnosed probably some obstructive air flow with bronchial basis, low back and leg strain, and mood disorder. The doctor prescribed an increased dose of Zyprexa (an anti-psychotic for bipolar disease), Skelaxin (a muscle relaxer), and Lodine (an anti-inflammatory used for osteoarthritis).

---

[1]Inflammation of the nasal passages.

On August 11, 2003, plaintiff went to Dr. Sandberg and reported falling two weeks earlier and complained of low back pain and a pressure-type feeling in her left thigh (Tr. 253). Plaintiff also reported feeling occasionally like she was moving in "slow motion." Dr. Sandberg diagnosed syncopal episode (fainting) and leg symptoms of unknown etiology (Tr. 253).

On September 22, 2003, Nora Clark, Ph.D., completed a psychological evaluation of plaintiff at the request of Disability Determinations (Tr. 224-226). Plaintiff reported depression, anxiety, and nightmares, which stemmed from a series of childhood traumas (Tr. 224). Plaintiff had no manic episodes, psychiatric hospitalizations, or outpatient mental health treatment (Tr. 224-25). Plaintiff's mood had "improved somewhat" since having left her husband a few months earlier (Tr. 224). Plaintiff reported that she cared for her daughter, who has cerebral palsy (Tr. 225). She also "work[ed] together" with her mother to wash dishes, clean the kitchen, and do laundry (Tr. 225). Dr. Clark observed normal speech, thought process, concentration, memory, and judgment (Tr. 225). Plaintiff appeared "moderately depressed" (Tr. 225). Dr. Clark diagnosed plaintiff with depression and post-traumatic stress disorder (Tr. 225). The doctor concluded that plaintiff could "perform most work-related functions in an ordinary work setting without difficulty" (Tr. 226). Plaintiff could understand and remember instructions, maintain concentration and persistence in tasks, and interact socially (Tr. 226).

On October 4, 2003, Amrit Pal Singh, M.D., Nodaway Medical Clinic, wrote a letter regarding a September 29, 2003, consultative examination of plaintiff (Tr. 220-223). During the examination, plaintiff reported that she was diagnosed with bipolar disorder four months earlier; diagnosed with hypertension two months earlier; suffered from nightmares; and complained of chronic bronchitis, arthritis, and lower back pain (Tr. 220). Plaintiff said she was "[p]resently

feeling better" (Tr. 220). Plaintiff reported joint pains in her shoulder, wrist, and knees, which were "partly" relieved by over-the-counter medication (Tr. 220). Plaintiff also reported "dull, non-radiating, and constant" lower back pain (Tr. 220). Dr. Singh observed that plaintiff had normal gait and "handled objects well" (Tr. 221). Plaintiff was able to get on and off the examination table without difficulty (Tr. 221). Plaintiff had "good" upper extremity strength and almost full range of motion in her knees (Tr. 234). A psychiatric examination revealed normal mood, memory, and judgment (Tr. 221). The doctor assessed plaintiff with hypertension (uncontrolled), bipolar depression (stable), chronic bronchitis, and degenerative joint disease involving multiple joints with spurs in both heels (Tr. 221).

On October 28, 2003, plaintiff went to Heartland Hospital for x-rays of her left knee, which revealed degenerative changes (Tr. 238, 355). An MRI was recommended if her symptoms persisted (Tr. 238, 355).

On January 12, 2004, plaintiff went to Northwest Health Services and reported that she had "good days and bad days" and her antidepressant medication was "helping" (Tr. 245). She also reported lower back pain (Tr. 245).

On January 12, 2004, plaintiff underwent pelvic x-rays, which were negative (Tr. 247-248).

On February 12, 2004, plaintiff went to Dr. Sandberg and complained of continued back pain and depression with good days and bad days (Tr. 245). Examination revealed lumbosacral tenderness. The doctor diagnosed low back pain, hypertension, and depression. The doctor refilled her medications and recommended an MRI (Tr. 245).

On February 13, 2004, an MRI was performed on plaintiff's lumbar spine (Tr. 243). The scan was done as a result of a fall three to four months earlier when plaintiff hit her tail bone on the

corner of a cement step (Tr. 243). The scan revealed "early degenerative disc disease" at L1-2 and L4-5 and a small amount of free fluid in the pelvis (Tr. 243-44).

On March 1, 2004, plaintiff went to Northwest Counseling Services and had her Zyprexa increased (Tr. 494).

On March 18, 2004, plaintiff was referred for mental health treatment with Dr. Menendez (Tr. 495-96). On intake, Dr. Menendez wrote in part:

> She has good eye contact and no overt movement disorder is noted. She is oriented times four. Memory is intact in three spheres except for those blackout periods. The patient demonstrated no overt cognitive disorganization. The patient admits to auditory and visual hallucinations and no delusions are noted. Her mood is depressed and anxious and her affect is congruent to her mood. The patient's intellect is in the average range and fund of knowledge is at grade level. Abstractions are mildly concrete. Insight and judgment are good. She denies any current suicidal or homicidal ideas (Tr. 496).

Dr. Menendez diagnosed plaintiff with depressive disorder and PTSD relating to sexual abuse she suffered as a child (Tr. 496). The doctor recommended plaintiff's Zyprexa be increased and her Prozac be re-evaluated for eventual discontinuation, change, or titration on the next visit (Tr. 496). The appointment lasted 30 minutes (Tr. 494).

On March 25, 2004, plaintiff saw Dr. Sandberg for a pap smear, and she reported that she was feeling "pretty good" overall (Tr. 240-242). Plaintiff reported problems with her hands and wrists from crocheting (Tr. 240). Plaintiff also reported some problems with her neck (Tr. 240). Plaintiff was diagnosed with hypertension, neck pain, and depression (Tr. 240).

On March 25, 2004, plaintiff went to Northwest Counseling Services and reported that her mood and anxiety were unchanged (Tr. 493). Dr. Menendez discontinued Prozac and prescribed Paxil (an antidepressant) (Tr. 493). The appointment was for medication management and lasted 15 minutes (Tr. 493).

On April 1, 2004, plaintiff went to Northwest Counseling Services and reported that she was sleeping better (Tr. 492). Plaintiff's medications were continued (Tr. 492). The appointment was for medication management and lasted 15 minutes (Tr. 492).

On April 29, 2004, plaintiff saw Dr. Menendez concerning her mental health problems (Tr. 491). The doctor noted that plaintiff's symptoms for audio hallucinations and nightmares had lessened but all other symptoms were the same (Tr. 491). Plaintiff reported that she was experiencing increased stress due to her recent divorce and her pending disability application (Tr. 491). Dr. Menendez increased plaintiff's dose of Paxil (Tr. 491). The appointment was for medication management and lasted 15 minutes (Tr. 491).

On May 13, 2004, plaintiff went to Northwest Counseling Services and reported that she was experiencing increased stress due to her recent divorce (Tr. 490). The appointment was for medication management and lasted 15 minutes (Tr. 490).

On June 21, 2004, plaintiff went to Northwest Counseling Services, and reported a eurhythmic mood and that she was "doing a lot of housework" and experiencing less stress (Tr. 489). The appointment was for medication management and lasted 15 minutes (Tr. 489).

On August 9, 2004, Nora Clark, Ph.D., completed a second psychological evaluation of plaintiff at the request of Disability Determinations (Tr. 320-322). Plaintiff appeared heavier and more anxious, and she walked heavier and had shortness of breath (Tr. 321). Dr. Clark's diagnostic impressions included chronic PTSD, psychotic disorder, alcohol dependence in remission, and resolving dysthymic disorder (chronic mood disorder within depression spectrum) (Tr. 321). Dr. Clark opined that plaintiff had made slight improvement since her last evaluation (Tr. 321). Dr. Clark noted that plaintiff's mental health improved over the last year, primarily because she had divorced

her abusive spouse (Tr. 320-321). Plaintiff was no longer depressed (Tr. 321). Nightmares woke plaintiff up about once per week, but she was usually able to go back to sleep (Tr. 320). Plaintiff was responding well to psychiatric treatment and counseling (Tr. 321). However, he cautioned that plaintiff's anxiety and intrusive memories of abuse might be expected to interfere at times with her ability to stay on task (Tr. 321). Dr. Clark concluded that plaintiff "would be able to perform most work-related functions in an ordinary work setting without difficulty" (Tr. 321).

On August 16, 2004, plaintiff went to see Dr. Menendez concerning her mental health problems (Tr. 488). All her conditions had lessened and the doctor noted improvement (Tr. 488). The appointment was for medication management and lasted 15 minutes (Tr. 488).

On August 16, 2004, plaintiff went to Northwest Counseling Services and reported that all her symptoms had lessened and that she was showing improvement (Tr. 488).

On August 19, 2004, Dr. Menendez completed a psychiatric impairment questionnaire (Tr. 344-351). The doctor assessed plaintiff with a Global Assessment of Functioning (GAF) score of 54[2] (Tr. 344). The doctor further concluded that plaintiff was markedly limited in 12 of 20 categories of mental functioning as follows:

- The ability to understand and remember detailed instructions.

- The ability to carry out detailed instructions.

- The ability to maintain attention and concentration for extended periods.

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

---

[2]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

- The ability to work in coordination with or proximity to others without being distracted by them.

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

- The ability to interact appropriately with the general public.

- The ability to accept instructions and respond appropriately to criticism from supervisors.

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

- The ability to respond appropriately to changes in the work setting.

- The ability to travel in unfamiliar places or use public transportation.

- The ability to set realistic goals or make plans independently of others.

    He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures.

- The ability to understand and remember very short and simple instructions.

- The ability to carry out very short and simple instructions.

- The ability to sustain an ordinary routine without special supervision.

- The ability to make simple work-related decisions.

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

- The ability to be aware of normal hazards and take appropriate precautions.

    Finally, he found plaintiff mildly limited in her ability to ask simple questions or request assistance.  (Tr. 347-349).

    On August 23, 2004, plaintiff went to Northwest Counseling Services and reported that all of her symptoms had lessened (Tr. 487). The appointment was for medication management and lasted

15 minutes (Tr. 487).

On August 25, 2004, David Cathcart, D.O., performed a consultative examination of plaintiff (Tr. 333-35). Plaintiff reported a history of depression, anxiety, bipolar/post-traumatic stress disorder, heel spurs, and muscle spasms (Tr. 333). Plaintiff walked without any assistance and was able to move from the chair to the examination table without difficulty (Tr. 334). Plaintiff had full range of motion in her shoulders, elbows, wrists, hands, hips, knees, and ankles (Tr. 334). She had normal strength and grip (Tr. 334). While plaintiff had "some low back tenderness," she had full range of motion (Tr. 334). Dr. Cathcart's impressions included chronic low back and leg pain suspected due to degenerative disc disease, history of knee and back osteoarthritis, anxiety/depression PTSD, and morbid obesity. Dr. Cathcart concluded that plaintiff's back and leg pain were due to obesity and osteoarthritis (Tr. 335). The doctor believed that these impairments "[did] not appear to be barriers to [her] return to work" (Tr. 335). Dr. Cathcart concluded that plaintiff could lift 25 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; and stand and walk for six hours in an eight-hour workday (Tr. 334). The doctor also opined that plaintiff should never balancing at unprotected heights and should only occasionally stoop, kneel, crouch, or crawl (Tr. 334).

On September 7, 2004, plaintiff went to Northwest Counseling Services and reported that she only heard voices once and she was sleeping six to eight hours per night (Tr. 486). The appointment was for medication management and lasted 15 minutes (Tr. 486).

On September 9, 2004, Dr. Sandberg completed a Multiple Impairments Questionnaire on plaintiff (Tr. 336-343). Dr. Sandberg diagnosed hypertension, osteoarthritis, depression, obesity, and low back pain (Tr. 336). Plaintiff's prognosis was shown as "fair" (Tr. 336). Clinical findings

included a weight of 308 pounds and blood pressure of 146/100 (Tr. 336). Dr. Sandberg cited to MRI results showing degenerative disc disease that also supported the diagnosis of back pain (Tr. 337). Plaintiff's primary symptoms were low back pain and arthritis of the knee, hips, and hands (Tr. 337). Plaintiff's pain was rated as moderate -- five on a ten-point scale -- and her fatigue was rated as three on a ten-point scale, or mild (Tr. 338). Dr. Sandberg opined that plaintiff was able to sit one hour total and stand/walk up to one hour in an eight-hour workday (Tr. 338). The doctor concluded that plaintiff could lift 10 pounds frequently and 20 pounds occasionally (Tr. 339). The doctor assessed moderate limitations in grasping, turning, and twisting objects; using fingers and hands for fine manipulations; and using arms for reaching including overhead (Tr. 339-340). Plaintiff's medications were listed as Zyprexa, Paxil, Lisinopril (a drug used for hypertension), Prozac, Foradil (a drug used for asthma), and Lodine (Tr. 340). The doctor indicated by checkmarks that plaintiff's symptoms would likely increase if she were placed in a competitive work environment and that they would interfere with her ability to keep the neck in a constant position (Tr. 340). The doctor opined that plaintiff's pain, fatigue, or other symptoms were frequently severe enough to interfere with her attention and concentration (Tr. 341). It was also noted that plaintiff suffered from depression that contributed to her symptoms and functional limitations, but that she was capable of handling low stress. Dr. Sandberg estimated that plaintiff needed to take unscheduled breaks at unpredictable intervals during an eight-hour workday, seven to eight times for 10 to 15 minutes each (Tr. 341). The doctor checked that plaintiff would be absent from work, on average, more than three times a month as a result of her impairments or treatment (Tr. 342). Other limitations that affected plaintiff's ability to work at a regular job on a sustained basis were a need to avoid temperature extremes, and no pulling, kneeling, bending, or stooping (Tr. 342).

On October 13, 2004, plaintiff went to Dr. Sandberg and reported feeling better about herself, but was experiencing continued cramping of both legs (Tr. 549). Plaintiff was diagnosed with hypertension and leg cramping (Tr. 549).

On October 13, 2004, plaintiff returned to Northwest Counseling Services and reported that there were no changes in her depression and anxiety (Tr. 485). The interview was for a medication check and lasted 15 minutes (Tr. 485).

On November 10, 2004, plaintiff went to Dr. Menendez for her mental health problems and reported no change in her depression and anxiety (Tr. 484). The doctor noted that plaintiff had only one nightmare (Tr. 484). The appointment was for a medication check and lasted 15 minutes (Tr. 484).

On November 17, 2004, plaintiff saw Dr. Menendez and was diagnosed with PTSD, depressive disorder, and being a sexual-abuse victim (Tr. 473).

On December 8, 2004, plaintiff went to Dr. Menendez for her mental health problems and reported no change/lessened in her depression and anxiety (Tr. 483). The doctor noted that plaintiff was "partially stable" and continued her on her medications (Tr. 483). The appointment was for a medication check and lasted 15 minutes (Tr. 483).

On December 9, 2004, plaintiff returned to Dr. Sandberg and she reported "feeling better" with counseling for her depression (Tr. 548). Plaintiff complained of not eating much and pain in her tailbone (Tr. 548). The doctor diagnosed hypertension, edema, weight gain, and low back pain. Plaintiff was prescribed Lasix (a water pill) and referred to the pain clinic to see Norman Baade, D.O. (Tr. 548).

On January 10, 2005, Dr. Baade conducted a consultative examination of plaintiff at the request of Dr. Sandberg (Tr. 383). The examination showed normal strength in the lower extremities and positive trigger points in her back at L-2, L-3, and L-4 (Tr. 384). Dr. Baade recommended physical therapy for plaintiff's back pain (Tr. 384). The doctor assessed plaintiff with myofascial disease, degenerative changes, and slight obesity (Tr. 384). During the examination, the doctor noted that plaintiff's weight was 319.5 pounds and her blood pressure was 139/93 (Tr. 462). The notes reflect that plaintiff forgot to bring in her medications but represented that she was on no pain medications (Tr. 462). Plaintiff alleged that her pain was six on a scale of one to ten (Tr. 462).

On February 1, 2005, Dr. Baade ordered a new lumbar spine MRI when plaintiff reported no improvement after physical therapy (Tr. 378). The MRI showed "mild" degenerative changes at L4-5 (Tr. 373-374). Plaintiff stated that her pain increased with activity (Tr. 373). Dr. Baade recommended "a walking program" to get plaintiff back in shape and decrease her weight, and steroid injections (Tr. 374).

On February 15, 2005, plaintiff saw Norman F. Baade, D.O., about her back pain and reported that the physical therapy was not working (Tr. 373-374). Plaintiff was told to start a walking program and was given an epidural (Tr. 374).

On February 15, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported no change in her depression and anxiety (Tr. 482). The appointment was for medication check and lasted 15 minutes (Tr. 482). Plaintiff denied suicidal thoughts and said she was "[m]otivated to get better" (Tr. 482). Dr. Menendez noted that her symptoms were "triggered by external sources" (Tr. 482).

On March 4, 2005, plaintiff saw Norman F. Baade, D.O., about her back pain and reported that her back was "slightly better" (Tr. 372). Plaintiff was given a second epidural (Tr. 372).

On April 13, 2005, plaintiff saw Norman F. Baade, D.O., about her back pain and reported that she was "doing excellent" (Tr. 366, 564). Plaintiff described her pain as a "dull ache off & on - better" (Tr. 365).

On May 10, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported no change in her depression and anxiety (Tr. 481). The notes reflect that plaintiff was "[d]oing OK essentially" (Tr. 481). The appointment was for medication check and lasted 15 minutes (Tr. 481).

On May 17, 2005, plaintiff reported to the emergency room at Heartland Hospital complaining about back spasms (Tr. 554-557). Plaintiff rated her pain as "10 out of 10" and said that it worsened with any movement (Tr. 554). The treating physician noted, however, that she "was able to ambulate to the rest room with little difficulty" (Tr. 554). An x-ray of the lumbar spine revealed degenerative joint disease with some subluxation[3] at L-4 and L-5 (Tr. 555-56). The treating physician prescribed pain medication and limited plaintiff to lifting, pushing, or pulling no more than 10 pounds for the next five days (Tr. 555).

On May 19, 2005, plaintiff sought medical care from a clinic following her emergency room visit for back spasms (Tr. 545). The physical examination showed plaintiff as 5' 4" tall and weighing 325 pounds (Tr. 545). Plaintiff was assessed as morbidly obese with back pain, and was encouraged to lose weight (Tr. 545).

On May 20, 2005, plaintiff was went to Dr. Sandberg and was diagnosed with back spasms (Tr. 544).

_____

[3]Partial dislocation of a joint.

On August 2, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported that her depression and anxiety had increased (Tr. 480). The appointment was for medication check and lasted 15 minutes (Tr. 480).

On August 16, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported no change in her depression and anxiety (Tr. 479). The doctor noted that plaintiff was a little better (Tr. 479). The appointment was for medication check and lasted 15 minutes (Tr. 479). The doctor increased plaintiff's Paxil (Tr. 479).

On September 6, 2005, plaintiff returned to Norman F. Baade, D.O., concerning her back problems (Tr. 454-455). Plaintiff reported no new problems (Tr. 454). Dr. Baade noted that she "did well with [her injections]" (Tr. 454). Plaintiff was given another epidural (Tr. 455).

On September 12, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported that her depression and anxiety had lessened (Tr. 478). The appointment was for medication check and lasted 15 minutes (Tr. 478).

On October 5, 2005, plaintiff saw Norman F. Baade, D.O., and reported that she fell down the stairs a week earlier (Tr. 452-453). Plaintiff was given another epidural (Tr. 453).

On October 26, 2005, plaintiff saw Norman F. Baade, D.O., and reported that she was "doing well" and "walking better" after another injection (Tr. 450-451). Plaintiff was given another epidural (Tr. 451).

On November 16, 2005, plaintiff saw Norman F. Baade, D.O., and reported that she was doing "excellent," had lost 10 pounds, and was not taking any pain medication (Tr. 449). The doctor diagnosed radiculopathy (a condition caused by a compressed nerve in the spine) and recommended that plaintiff continue her regimen (Tr. 449).

On November 23, 2005, V. Nanda Kumar, M.D., saw plaintiff on a referral from Dr. Sandberg (Tr. 395-397, 561-563). Plaintiff walked into the clinic unassisted (Tr. 395). Plaintiff rated her pain a five to six on a 10-point scale (Tr. 395). On examination, Dr. Kumar noted diffuse tenderness in the lumbar facet joints bilaterally, para lumbar muscle spasms bilaterally, flexion up to 50 degrees and extension to 0 degrees, and lateral bending to 10 degrees in each direction (Tr. 395). Dr. Kumar performed nerve conduction studies and an EMG (Tr. 396). His impression was bilateral LS radiculopathy, chronic low back pain secondary to degenerative joint disease, and morbid obesity. The doctor commented that plaintiff was probably a good candidate for a series of lumbar epidural blocks for pain relief and stated, "She is definitely disabled from any gainful employment and should not be doing any bending, stooping, lifting or prolonged sitting or standing. She is not fit to return to any type of gainful employment in the foreseeable future." (Tr. 396).

On December 6, 2005, plaintiff went to Dr. Menendez for her mental health problems and reported that her depression and anxiety had lessened (Tr. 477). The doctor noted that plaintiff had done well since her last visit (Tr. 477). Plaintiff was reported to be in a "good mood"(Tr. 477). The appointment lasted 15 minutes and dealt with plaintiff's medication management (Tr. 477).

On December 13, 2005, plaintiff saw Dr. Baade and reported that she had lost 27 pounds (Tr. 448). Plaintiff was diagnosed with lumbar radiculopathy, and she was prescribed Neurontin (pain reliever) (Tr. 448).

On December 15, 2005, Dr. Kumar, completed a Lumbar Spine Impairment Questionnaire, wherein the doctor noted that plaintiff was treated most recently every three weeks (Tr. 386-392). Dr. Kumar diagnosed bilateral lumbosacral radiculopathy, back pain, degenerative joint disease of the lumbar spine, and morbid obesity. Plaintiff's prognosis was poor (Tr. 386). Clinical findings were

limited range of motion (flexion to 50 degrees, extension to 0 degrees, and lateral bending to 10 degrees), tenderness of the lumbar facet joints from L2 through L5, muscle spasm in the lumbar muscles, wide-based gait, sensory loss in the medial legs, positive straight leg raising to 50 degrees bilaterally, and weakness of the dorsi flexors of the feet (Tr. 386-387). Dr. Kumar found no swelling, no reflex changes, no muscle atrophy, no muscle weakness, no crepitus, and no trigger points (Tr. 386-387). Dr. Kumar cited to EMG and NCV studies that supported his findings (Tr. 387). Plaintiff's primary symptoms were pain in the lower back with radiation to the lower extremities (Tr. 387). Dr. Kumar opined that plaintiff was able to sit one to two hours total and stand/walk up to one hour total in an eight-hour workday (Tr. 388). Further, the doctor noted that plaintiff could only occasionally lift up to five pounds or carry up to 10 pounds (Tr. 389). The doctor reported that plaintiff was incapable of even low stress work (Tr. 390). Dr. Kumar estimated that plaintiff needed to take unscheduled breaks to rest during an eight-hour day every one to two hours, and needed to rest 15 to 30 minutes each time before returning to work (Tr. 391). Dr. Kumar found that plaintiff would be absent from work, on average, more than three times a month as a result of her impairments or treatment. Other limitations that affected her ability to work at a regular job on a sustained basis were psychological limitations, a need to avoid noise, temperature extremes, heights, and no pushing, pulling, kneeling, bending, and stooping (Tr. 391). Dr. Kumar opined that the symptoms and limitations described were present for the past "several years" (Tr. 391). Dr. Kumar concluded that plaintiff was "permanently disabled for any type of 8 hour job" (Tr. 392).

That same day Dr. Kumar reported that plaintiff was totally disabled due to pain in her back (Tr. 394). Dr. Kumar completed a lumbar questionnaire and stated that plaintiff could lift five pounds occasionally, sit for two hours in an eight-hour workday, and stand and walk for one hour in an

eight-hour workday (Tr. 388-89). Dr. Kumar concluded by stating that plaintiff was permanently disabled for any type of eight-hour work (Tr. 392).

On January 10, 2006, plaintiff saw Norman F. Baade, D.O., and reported continuing back pain but no new symptoms (Tr. 560). Dr. Baade noted that she was "30% better" (Tr. 560). Plaintiff was assessed with lumbar radiculopathy and obesity (Tr. 447). Plaintiff was continued on Neurontin (Tr. 447).

On February 8, 2006, plaintiff saw Dr. Sandberg for a check up on blood pressure (Tr. 575). She also reported a sore throat and cough (Tr. 575). Plaintiff complained of lower back pain and spasms with coughing (Tr. 575). Plaintiff's blood pressure was 144/82, and her weight was recorded at 324 pounds (Tr. 575). The doctor diagnosed sinusitis and acute bronchitis (Tr. 576).

On March 8, 2006, plaintiff saw Norman F. Baade, D.O., about her back pain and reported that Neurontin had helped her symptoms (Tr. 445). Plaintiff had lost 18 pounds (Tr. 445). She was doing well with her walking (eight blocks at a time), and Dr. Baade recommended that she walk further distances (10 to 12 blocks) (Tr. 445).

On May 23, 2006, plaintiff returned to Dr. Menendez and had no change in her depression and anxiety (Tr. 475). The appointment was for a medication check and lasted 15 minutes (Tr. 475). The notes reflect that plaintiff was sleeping well with medication (Tr. 475). The doctor increased plaintiff's Zyprexa (Tr. 475).

On May 24, 2006, plaintiff saw Norman F. Baade, D.O., and reported that she had lost 23 pounds (Tr. 443). The doctor recommended that plaintiff continue her walking program (Tr. 443).

On June 29, 2006, plaintiff went to see Dr. Menendez and reported no change in her depression and anxiety (Tr. 474). The appointment was for medication check and lasted 15 minutes

(Tr. 474).

On August 21, 2006, plaintiff saw Norman F. Baade, D.O., complaining about increased pain from doing the laundry (Tr. 501). Dr. Baade diagnosed myofascial disease and lumbar radiculopathy (Tr. 501-502). The doctor gave plaintiff a trigger point injection (Tr. 501-502).

On August 28, 2006, Dr. Menendez performed a psychiatric assessment of plaintiff (Tr. 517-518). Dr. Menendez stated that plaintiff had "[n]o significant changes" since he last evaluated her in March 2004 (Tr. 517). Plaintiff reported no insomnia or nightmares (Tr. 517). Plaintiff was "organized with a euthymic [normal] mood" (Tr. 517). Plaintiff demonstrated normal speech, memory, intellect, insight, and judgment (Tr. 518). Plaintiff denied suicidal thoughts and hallucinations (Tr. 518). The doctor noted that plaintiff had been losing weight and did not know how she was doing it (Tr. 517). The doctor assigned plaintiff a GAF of 58 (Tr. 518).[4] The doctor diagnosed plaintiff with major depression and PTSD due to sexual abuse as a child (Tr. 518). The doctor continued plaintiff on Rozerem (a drug used for insomnia), Zyprexa, and Paxil (Tr. 518).

On October 24, 2006, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression and anxiety (Tr. 514). The appointment was for medicine check and it lasted 15 minutes (Tr. 514).

On October 24, 2006, plaintiff saw Norman F. Baade, D.O., and complained about some spasms at night for which she was given samples of Skelaxin (muscle relaxer) (Tr. 499). Dr. Baade gave her a trigger point injection (Tr. 499-500).

---

[4]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

On December 8, 2006, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression but increased anxiety (Tr. 513). The appointment was for medicine check and it lasted 15 minutes (Tr. 513).

On January 11, 2007, plaintiff saw Dr. Menendez and the doctor noted plaintiff's depression and anxiety had "lessened" (Tr. 512). The notes reflect that plaintiff had organized thoughts (Tr. 512). The appointment was for medicine check and lasted 15 minutes (Tr. 512).

On January 25, 2007, plaintiff saw Dr. Menendez and the doctor noted "much decreased" in plaintiff's depression and anxiety (Tr. 511). The appointment was for medicine check and it lasted 15 minutes (Tr. 511).

On February 22, 2007, plaintiff saw Dr. Menendez and the doctor noted "much decreased" in plaintiff's depression and anxiety (Tr. 510). The notes show plaintiff had a "euthymic" mood (Tr. 510). The appointment was for medicine check and lasted 15 minutes (Tr. 510).

On March 2, 2007, plaintiff returned to Norman F. Baade, D.O., for pain management (Tr. 609). Plaintiff reportedly was on home oxygen (Tr. 609). Dr. Baade continued plaintiff on Skelaxin and Neurontin (Tr. 609). The doctor sought a new lumbar MRI (Tr. 609).

On March 7, 2007, plaintiff went to Dr. Sandberg for a hospital follow-up visit and reported feeling tired and experiencing shortness of breath (Tr. 570). Plaintiff was diagnosed as feeling tired or poorly with chronic obstructive pulmonary disease and hypoxia (inadequate oxygen) (Tr. 570).

On March 13, 2007, plaintiff returned to Norman F. Baade, D.O., for pain management (Tr. 610). Plaintiff reportedly fell that morning (Tr. 608). Plaintiff stated that she was unable to fit into an open MRI (Tr. 610). Dr. Baade noted that he would send plaintiff to get an MRI at Independence (Tr. 610).

On March 16, 2007, plaintiff went to Heartland Hospital for a complete pulmonary function test (Tr. 582). The pulmonary function testing revealed moderate obstructive lung disease, mild restrictive lung disease, and mild reduction in diffusion capacity corrected for the volume (Tr. 582). The flow volume loop was suggestive of obstructive and restrictive lung disease (Tr. 582).

On March 22, 2007, plaintiff saw Dr. Menendez and the doctor noted an increase in plaintiff's depression (Tr. 508-509). Plaintiff's mood had "slowly deteriorated" (Tr. 508). The appointment was for medicine check but there is not indication in the record as to how long it lasted (Tr. 508).

On May 3, 2007, plaintiff returned to Dr. Sandberg for a check-up and the results from testing (Tr. 568-569). Plaintiff continued to complain of shortness of breath (improved with oxygen), coughing, decreased appetite, and soft tissue swelling of the ankles and feet (Tr. 568). Plaintiff had blood pressure of 128/78 and was observed to be obese with a weight of 324 pounds (Tr. 569). Examination revealed a decrease in breath sounds with normal respiration and rhythm (Tr. 569). The doctor diagnosed chronic obstructive pulmonary disease and prescribed oxygen and Advair (a drug used to manage asthma)(Tr. 569).

On May 7, 2007, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression and anxiety (Tr. 593). The appointment was for medicine check and it lasted 15 minutes (Tr. 593).

On June 25, 2007, plaintiff saw Dr. Menendez and the doctor noted no change in plaintiff's depression but an increase in her anxiety (Tr. 592). The appointment was for medicine check and it lasted 15 minutes (Tr. 592).

On July 3, 2007, plaintiff saw Dr. Menendez and the doctor noted that plaintiff's depression and anxiety had "lessened" (Tr. 591). The notes also reflect that plaintiff's nights were better but her

days were still difficult (Tr. 591). The appointment was for medicine check and lasted 15 minutes (Tr. 591).

On July 31, 2007, plaintiff saw Dr. Menendez and the doctor noted that plaintiff's depression and anxiety were "much decreased" (Tr. 590). The notes also record "[i]mproving mood" and "[decreased] anxiety" (Tr. 590). The appointment was for medicine check and it lasted 15 minutes (Tr. 590).

On August 29, 2007, plaintiff saw Dr. Menendez and the doctor noted that plaintiff's depression and anxiety were "much decreased" (Tr. 515-516). The notes also reflect that plaintiff was losing weight but did not know why (Tr. 516).

On August 31, 2007, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression and anxiety (Tr. 589). The notes reflect "no real diff[iculty]" and "relatively stable" (Tr. 589). The appointment was for medicine check and it lasted 15 minutes (Tr. 589).

On October 1, 2007, plaintiff returned to Norman F. Baade, D.O., for pain management (Tr. 608). It had been about six and a half months since plaintiff was seen for pain management. Plaintiff's verbal analog score was 8/10 (Tr. 603). Plaintiff reportedly had lost 15 pounds but had not gotten the requested MRI (Tr. 608). Dr. Baade restarted plaintiff on Skelaxin and continued her Neurontin (Tr. 608).

On October 3, 2007, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression and anxiety (Tr. 588). The notes reflect plaintiff being more impulsive and angry (Tr. 588). The appointment was for medicine check and it lasted 15 minutes (Tr. 588).

On November 27, 2007, plaintiff saw Dr. Menendez and the doctor noted plaintiff's depression had increased and her anxiety was "much increased" (Tr. 587). The notes reflect that

plaintiff's pharmacy had not filled her prescriptions for the last month (Tr. 587). The appointment was for medicine check and it lasted 15 minutes (Tr. 587).

On December 27, 2007, plaintiff saw Dr. Menendez and the doctor noted "no change" in plaintiff's depression and anxiety (Tr. 586). The notes reflect that plaintiff's mother died but plaintiff was doing okay (Tr. 586). The notes also show that plaintiff was "stable" (Tr. 586). Plaintiff continued to deny suicidal thoughts (Tr. 586). The appointment was for medicine check and it lasted 15 minutes (Tr. 586).

On January 16, 2008, plaintiff saw Dr. Baade concerning her lower back pain (Tr. 602). Plaintiff reported that her mother had passed away and she had been doing some significant lifting (Tr. 602). Plaintiff had lost some additional weight, and she denied any new numbness or weakness (Tr. 602). The doctor continued plaintiff on her current medications (Tr. 602).

On January 28, 2008, plaintiff saw Dr. Menendez who made no changes to plaintiff's medications (Tr. 585). The appointment was for medication check and lasted 15 minutes (Tr. 585).

On March 11, 2008, plaintiff returned to Norman F. Baade, D.O., for pain management (Tr. 600). Plaintiff reportedly had lost 56 pounds (Tr. 600). Dr. Baade continued plaintiff on Skelaxin and Neurontin (Tr. 608).

On July 28, 2008, plaintiff returned to Norman F. Baade, D.O., for pain management (Tr. 598-599). Plaintiff reportedly had lost 15 pounds (Tr. 598). Dr. Baade continued plaintiff on Skelaxin and Neurontin (Tr. 598).

### C. SUMMARY OF TESTIMONY

During the April 2, 2007, administrative hearing, testimony was taken from plaintiff[5] (Tr. 22); Dr. Hershel Goren, a medical expert (Tr. 5); and Lesa Keen, a vocational expert (Tr. 34).

During the preliminary discussions, plaintiff's counsel amended plaintiff's onset date to August 1, 2002 (there were several dates listed in administrative record) (Tr. 632-633).

### 1.      Plaintiff's testimony

Plaintiff testified that she was then a 49-year-old with a GED (Tr. 650, 653). She had four children between the ages of 26 and 31 (Tr. 651). She lived with her disabled daughter, her son, her daughter-in-law, and her three grandchildren, whom she regularly watched (Tr. 651, 655). Plaintiff "pretty well takes care of her" 27-year-old disabled daughter, who has cerebral palsy (Tr. 651). This daughter is on disability (Tr. 651).

Plaintiff's last job was as a Wal-Mart cashier, which ended after six months because she could not "lift the heavy packages" (Tr. 653). Prior to that job, plaintiff worked for a casino for about a year and a half, which ended when she had problems with a supervisor (Tr. 654). Before that, plaintiff worked for three years at the Salvation Army, which ended when she could not do the heavy lifting (Tr. 654).

Plaintiff lives on money from babysitting her grandchildren when her son and daughter-in-law are at work (Tr. 655). Plaintiff could not recall her disability-onset date (Tr. 650).

---

[5]Plaintiff appeared late for the hearing (Tr. 631, 649). As a result, the ALJ restricted her testimony to allow sufficient time for the vocational expert to testify (Tr. 656, 661). The propriety of the ALJ's action became an issue after plaintiff's counsel wrote an April 9, 2007, letter to the ALJ requesting a supplemental hearing, which was denied for the reasons set forth in the ALJ's June 1, 2007, decision (Tr. 22-23).

Plaintiff 's "primary problem" was her back, which made it hard for her to lift (Tr. 655). She is unable to lift things for a long time because her hands will cramp (Tr. 656). Plaintiff was unsure if she could work a job that did not require heavy lifting but said she would "give it a try" (Tr. 656). Plaintiff was 5'4" tall and weighed 332 pounds at the time of the hearing (Tr. 650).

Plaintiff suffers from depression and low self-esteem but she has never hallucinated (Tr. 657, 659). Her medications make her tired and put her to sleep without her even realizing it (Tr. 659).

Plaintiff had been doing better since her divorce but still felt as though she was not mentally capable of working because she cannot tolerate being around "too many people" (Tr. 661).

## 2. Vocational expert testimony

Lesa Keen testified as a vocational expert at the hearing (Tr. 662-64).

The first hypothetical assumed an individual who could perform light work except that she could only occasionally stoop, crouch, crawl, and kneel and could not climb ladders, ropes, or scaffolds or work at unprotected heights (Tr. 662). The person could only do simple, routine work with no high-production quotas and could have only minimal public interaction (Tr. 662-63).

The vocational expert testified that such an individual would be able to perform the light, unskilled work of photocopy-machine operator, microfilm processor, and collator operator (Tr. 663).

The vocational expert testified that if an individual missed work two days per month, no jobs would be available (Tr. 663-664). A person who had to take breaks totaling one hour per day on average, would not be able to sustain employment (Tr. 664).

The vocational expert concluded by stating that her testimony was consistent with the Dictionary of Occupational Titles and its companion publication (Tr. 664).

### 3.       Medical expert testimony

Herschel Goren, M.D., testified as a medical expert at the hearing (Tr. 633-649).

Dr. Goren said that plaintiff's impairments do not meet or equal any listing, singularly or in combination (Tr. 635). Plaintiff's consultative examinations "were essentially normal" (Tr. 634). Dr. Goren could not see anything from Dr. Sandberg's notes that would allow him to conclude that plaintiff is disabled (Tr. 634). Dr. Goren also testified that Dr. Menendez's conclusion that plaintiff has marked difficulties in numerous areas of mental functioning is inconsistent with Dr. Menendez's treatment notes which reflect that plaintiff has only moderate mental limitations (Tr. 635, 638-639). Specifically, the doctor was asked the following questions and provided the following answers about plaintiff's medical record:

Q       And with that, have we provided you with enough information that you can tell us about the claimant's condition?

A       Yes.

Q       All right, would you do so, please?

A       Sure. Claimant has lumbar spine pain for which I use listing 104. In the remote past, specifically in 1993, she had fracture to the left lower limb. She seems to have recovered from that. The fracture is described at 1F, page 6 and satisfactory recovery is obvious from 1F, page 5. She's been examined for consultative evaluations by Dr. Sing[h] at 3F and 4F. Those examinations were done on . . . September 29, 2003, by Dr. Katar [phonetic] on August 25, 2004. That's at l0F. Each examination[] [was] essentially normal. We have [a] conclusive statement from treating physician Sandberg on September 9, 2004 at 11F indicating that claimant is functioning really at much less than a sedentary level. I don't see anything from Dr. Sandberg's notes that would allow him to come to his conclusion. There's an examination by Dr. Ba[a]de, an anesthesiologist on January 11, 2005. That's in 13F, pages 19 through 21. Examination was essentially normal. Dr. Kumar, a treating podiatrist, examined claimant on November 23, 2005. That is 14F, pages 10 and 11 and . . . concluded on his first examination that claimant was disabled. I don't see how Dr. Kumar could have come to that conclusion. Examination was normal. But in support of that, Dr. Kumar wrote to counsel on December 15th, 2005, that's at 14F, also indicating the claimant was disabled. . . . [T]here have been no films of the lumbar spine. There

have been no MRIs. Two EMGs were done, the second of which [was] done on November 23, 2005, [and] showed [the] presence of radiculopathy, that at 14F, page 11. The first one in 1999 was normal. . . . I also noted that claimant was overweight so I computed 1.00Q. I noted claimant has mental problems, specifically depressive disorder not otherwise specified, for which you'd use listing 12.04 and post-traumatic stress disorder, which is covered by listing 12.0685. We have a consultative evaluation by Dr. Clark. The first is September 22, 2003. It's at 3F. The second is at 9F. First time, the first time Dr. Clark noted the use of alcohol until age 25. Dr. Clark felt that claimant was moderately impaired the first time, and the second time she felt that claimant was actually slightly improved. We have a treating psychiatrist, Dr. Menendez, on . . . March 18, 2004 gave a GAF of 51, which is moderately impaired. That's in 21F, pages 27 and 28. In spite of that, the same Dr. Menendez wrote to counsel on August 16, 2004 at 11F indicating number one that the GAF was 54, which is moderately impaired but he indicated that claimant has marked difficulties with concentration, persistence, and pace and with social functioning. That's inconsistent with his own GAF. Dr. Menendez on November 2004 gave a GAF of 60. That's at 2lF, page 5 . For my reading of the evidential [sic] records, the claimant's problems do not meet or equal any listings either individually or in combination, but you would have in search of a work place related to lumbar spine pain complicated by being overweight, depression, and post-traumatic stress disorder.

(Tr. 633-635.)

Dr. Goren stated that, from the medical records, plaintiff could occasionally lift or carry 20 pounds and frequently lift 10 pounds (Tr. 635). Dr. Goren placed no restrictions on plaintiff's sitting, standing, or walking (Tr. 635).

## V. FINDINGS OF THE ALJ

The ALJ issued her decision on June 1, 2007 (Tr. 15-24). The judge concluded that claimant is not entitled to a period of disability, disability insurance benefits or supplemental security income under the Act (Tr. 24).

The ALJ made the following findings:

1.   The [plaintiff] met the disability insured status requirements of the Act on August 1,2002, the date the plaintiff stated she became unable to work, and continues to meet them through the date of the decision.

2.   The [plaintiff] has not engaged in substantial gainful activity since August 1, 2002.

3.  The [plaintiff] has the following "severe" impairments that have more than a minimal impact on her ability to perform basic work activities: degenerative disc disease with low back pain and radiculopathy, obesity, depressive disorder and post traumatic stress disorder.

4.  The evidence does not establish medical findings that meet or equal in severity the clinical criteria of any impairment listed in Appendix I, Subpart P, Regulation No.4.

5.  The testimony and allegations by the [plaintiff] are only partially credible.

6.  The [plaintiff's] residual functional capacity is as propounded in the hypothetical question to the vocational expert at the hearing as follows: the plaintiff can perform light work, including lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. Plaintiff can occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. Plaintiff should not work at unprotected heights. Regarding her mental limitations, the plaintiff can perform simple, routine work, but must avoid work involving high production quotas. Plaintiff is moderately limited in her ability to interact with the general public, with "moderately" meaning she has some difficulty but can still function satisfactorily.

7.  The [plaintiff] is precluded from performing her past relevant work and has no transferable skills.

8.  The [plaintiff] is 49 years old, which is a "younger individual, age 45-49," and has a high school education.

9.  Based on the [plaintiff's] age, education, vocational experience and residual functional capacity and the vocational expert's testimony, the plaintiff can perform work that exists in significant numbers in the regional and national economies. Examples of such work are as a photo copy machine operator. microfilm processor and collator operator.

10. The [plaintiff] has not been under a "disability," as defined in the Regulations, at any time since August 1, 2002 .

(Tr. 23-24).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

## 1. PRIOR WORK RECORD

A review of the earnings record does not support plaintiff's credibility. Between 1972 and 2002, a period of 20 years, plaintiff had zero income in eight years and less than $1,000.00 in seven of the remaining years (Tr. 67).

Plaintiff represented in a July 26, 2003, work activity report that she became disabled and was unable to continue working at Wal-Mart on July 15, 2002 (Tr. 104), yet she completed an August 29, 2002, medical examination for a school bus operator's licence in which she reported no significant past or existing medical conditions (Tr. 324). In addition, a medical examiner at the time certified that plaintiff was qualified to safely operate a school bus (Tr. 324).

In a September 22, 2003, interview with Nora Clark, Ph.D., plaintiff reported that her two longest jobs were as a clerk for the Riverboat for 18 months in 2000, and as a cashier for Wal-Mart for 13 months from July 2001 to September 2002 (Tr. 225).

Plaintiff's work record does not support her credibility. Additionally, the work record discredits the July 19, 2004, function report completed by her daughter, Yolanda Erickson, who represented that plaintiff "always worked" (Tr. 161).

## 2. DAILY ACTIVITIES

The record establishes that plaintiff takes care of herself and her handicapped adult daughter; she cleans the house, does the laundry, and fixes meals; she drives a car and shops; she cares for her grandchildren; and she attends her medical appointments without assistance (Tr. 145-153). This description of plaintiff's day-to-day activities is, in large part, corroborated by her other daughter, Yolanda Erickson, in a July 19, 2004, function report (Tr. 154-162).

The medical reports make several references to plaintiff engaging in normal, everyday, daily activities during the period when she alleges she was disabled: on April 16, 2003, plaintiff was taking out the trash (Tr. 236-237; 358); on June 21, 2004, plaintiff was doing a lot of housework (Tr. 489); on February 15, 2005, plaintiff's back problems were being addressed through a "walking program" (Tr. 374); and on March 8, 2006, and May 24, 2006, plaintiff's pain and weight issues were being

addressed by the walking program (Tr. 443, 445).

On September 22, 2003, plaintiff told Dr. Clark that she cared for her daughter, who has cerebral palsy (Tr. 225). Plaintiff also said that she "work[ed] together" with her mother to wash dishes and clean the kitchen; and to do laundry, grocery shopping, and errands (Tr. 225).

During the April 2, 2007, administrative hearing, plaintiff testified that she cares for her 27-year-old disabled daughter, and that she is paid by her son and daughter-in-law to provide daycare services for her grandchildren (Tr. 655).

These daily activities are inconsistent with plaintiff's subjective claims of disability.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff alleges that debilitating symptoms from psychiatric problems (essentially depression and anxiety) and physical problems (chiefly back problems) preclude her from working. However, the medical records do not support plaintiff's description of her symptoms.

#### a. Psychiatric Symptoms

There is no question that plaintiff has been diagnosed with depression and anxiety but these conditions are not so serious as to render her incapable of working.

In a September 22, 2003, interview with Nora Clark, Ph.D., who was performing a psychological evaluation at the request of the agency, plaintiff came off as very passive and unmotivated to improve her life, apart from escaping from her abusive husband. Dr. Clark wrote:

> [Plaintiff's] affect was blunted and her mood appeared moderately depressed. She denied recent suicidal or homicidal ideation. She denied history of any symptoms consistent with manic or hypomanic episodes. She denied any additional psychiatric complaints other than those previously described. Brief mental status examination showed normal orientation, attention and concentration . . . , adequate recall of personal and factual information, and appropriate responses to questions assessing simple addition and subtraction, abstract reasoning, and judgment.

37

(Tr. 225.) At Axis I, Dr. Clark diagnosed plaintiff with dysthymic disorder, posttraumatic stress disorder (chronic) and alcohol dependence (in remission) (Tr. 225). Dr. Clark concluded that plaintiff could perform most work-related functions in an ordinary work setting without difficulty, although anxiety and intrusive memories might be expected to interfere at times with plaintiff's ability to adapt to her environment (Tr. 226).

As to the treatment for her mental condition, plaintiff did not begin seeing Dr. Menendez, a psychiatrist, until March 18, 2004 - more than a year and a half after her alleged onset date of August 1, 2002 (Tr. 495-96). At the initial intake lasting 30 minutes, Dr. Menendez wrote:

> She has good eye contact and no overt movement disorder is noted. She is oriented times four. Memory is intact in three spheres except for those blackout periods. The patient demonstrated no overt cognitive disorganization. The patient admits to auditory and visual hallucinations and no delusions are noted. Her mood is depressed and anxious and her affect is congruent to her mood. The patient's intellect is in the average range and fund of knowledge is at grade level. Abstractions are mildly concrete. Insight and judgment are good. She denies any current suicidal or homicidal ideas.

(Tr. 496.) Dr. Menendez diagnosed plaintiff with depressive disorder and PTSD (Tr. 496).

Following the initial intake, Dr. Menendez's notes reflect that he had monthly meetings with plaintiff, each lasting about 15 minutes, to manage her medication. From 2004 to 2008, the doctor's notes reflect that plaintiff's condition was stable and largely controlled through medication, although her symptoms would occasionally flare up in response to situational stressors (e.g., divorce, plaintiff's pending disability claim, plaintiff's pharmacy had failed to fill her prescriptions for a month) (Tr. 475, 477, 478, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 493, 510, 511, 512, 513, 514, 515-516, 586, 588, 590, 591).

### b. Physical Symptoms

Concerning plaintiff's physical problems, plaintiff listed the following physical complaints in a July 26, 2003, disability report: heel spurs, muscle spasms, hypertension, bursitis, and breathing problems (Tr. 114). Back problems - plaintiff's chief complaint - are not even listed among her disabilities almost a year after her alleged onset date. At the April 2, 2007, administrative hearing, however, plaintiff testified that her "primary problem" is her back, which makes it difficult for her to lift (Tr. 655). The record does not support plaintiff's allegation that any of plaintiff's physical conditions or all of them in combination are disabling.

Plaintiff completed a work activity report on July 26, 2003, in which she represented that she left her last employment at Wal-Mart on July 15, 2002, because of her medical condition (Tr. 104). In a disability report completed the same day, plaintiff explained that she quit Wal-Mart because her feet swelled, and her hands and arms hurt (Tr. 115). However, the first entry in the medical records for any treatment - mental or physical - occurred on February 5, 2003 (six months after her alleged onset date), when plaintiff went to see Dr. Sandberg for a pap smear and checkup (Tr. 211). The first entry complaining anything to do with back pain - plaintiff's chief physical complaint - occurred on June 9, 2003 (10 months after plaintiff's alleged onset date), when plaintiff went to see Dr. Sandberg for cough and congestion and mentioned leg and back pain (Tr. 255). The doctor upon examination found thigh tenderness, some discomfort with straight leg raising, and palpable muscle spasm in the lumbar paravertebral area (Tr. 255). The doctor diagnosed low back and leg sprain (Tr. 255).

Plaintiff's back pain was caused by a fall in late 2003, when she hit her tail bone on the corner of a cement step (Tr. 243-244). A February 13, 2004, MRI of the lumbar spine (a year and a half after plaintiff's alleged onset date) showed normal alignment, normal vertebral body heights, normal

vertebral body signal intensities, mild loss of high signal intensity on T2 - weighted images in L1/2 and L4/5 discs, and normal disc heights and signal intensities in the remainder on T2 - weighted images (Tr. 234). The impressions included "[c]hanges of early degenerative disc disease at L1/2 and L4/5, and small amount of free fluid in pelvis (Tr. 234).

Plaintiff's back pain again emerges in the medical records as a complaint on December 9, 2004, when she saw Dr. Sandberg and was diagnosed with low back pain (Tr. 548). The doctor referred plaintiff to Dr. Baade at a pain clinic (Tr. 548).

On January 10, 2005, Dr. Baade found normal strength in the lower extremities and positive trigger points in plaintiff's back at L-2, L-3, and L-4 (Tr. 384). Dr. Baade recommended physical therapy for plaintiff's back pain (Tr. 384). The doctor assessed plaintiff with myofascial disease, degenerative changes, and slight obesity[6] (Tr. 384). During the examination, the doctor noted that plaintiff's weight was 319.5 pounds and her blood pressure was 139/93 (Tr. 462). The notes reflect that plaintiff represented that she was on no pain medications (Tr. 462). Plaintiff alleged that her pain was six on a scale of one to ten (Tr. 462).

On February 1, 2005, Dr. Baade ordered a new lumbar spine MRI (Tr. 378). The MRI showed only mild degenerative changes at L4-5 (Tr. 373-374). Dr. Baade recommended a walking program to get plaintiff back in shape and decrease her weight, along with steroid injections (Tr. 374).

Plaintiff continued to complain about back problems but the records hardly support the conclusion that this condition is disabling:

> On February 15, 2005, Dr. Baade again recommended that plaintiff start a walking program to deal with her back pain (Tr. 374);

---

[6]Given plaintiff's height and weight, the diagnosis of "slight" obesity is puzzling.

On March 4, 2005, plaintiff saw Dr. Baade and reported that her back problems were slightly better and she was given an epidural (Tr. 372);

On April 13, 2005, plaintiff saw Dr. Baade and reported that she was "doing excellent" and the pain was a "dull ache off & on -better" (Tr. 365);

On May 17, 2005, plaintiff went to the emergency room with back spasms and pain rated as 10/10, but she was able to ambulate to the rest room without difficulty and the lumbar x-ray showed degenerative joint disease with some subluxation at L-4 and L-5 (Tr. 554-555);

On May 19, 2005, plaintiff went to a clinic to follow up on her back spasms and was told to lose weight (plaintiff weighed 325 pounds and was 5' 4" tall) (Tr. 545);

Dr. Baade's September 6, 2005, notes reflect that plaintiff was doing well with the epidural injections (Tr. 454);

On November 16, 2004, Dr. Baade noted that plaintiff was doing "excellent," had lost 10 pounds, and was not taking pain medication (Tr. 449);

On January 10, 2006, plaintiff reported continued back problems with no new symptoms, and Dr. Baade found that she was "30% better";

On February 8, 2006, plaintiff complained about lower back problems but she weighed 324 pounds (Tr. 575);

On March 8, 2006, plaintiff, having lost 18 pounds, reported that Neurontin had helped with her back problems (Tr, 445);

On October 24, 2006, plaintiff complained about back spasms at night, for which she was given Skelaxin, a muscle relaxer, and an injection (Tr. 499-500);

On October 1, 2007, plaintiff complained about back pain (rated 8/10); Dr. Baade restarted Skelaxin and continued her Neurontin (Tr. 608);

By March 11, 2008, plaintiff had lost 56 pounds; Dr. Baade continued plaintiff on Skelaxin and Neurontin (Tr. 600, 608); and

On July 28, 2008, plaintiff had lost another 15 pounds; she was continued on Skelaxin and Neurontin (Tr. 598).

There are at least four conclusions one can draw from these medical records about plaintiff's

physical condition: (1) the plaintiff's treatment for back problems has been conservative; (2)

plaintiff's back problems tend to improve when she engages in a walking program and loses weight; (3) none of plaintiff's treating physicians (i.e., Dr. Sandberg or Dr. Baade) has recommended surgery or imposed any physical restrictions on her because of back problems; and (4) plaintiff's conservative medical treatment (medications and epidural injections) seems to be effective in dealing with her back pain.

### c. Conclusion

From this analysis, I conclude that the duration, frequency, and intensity of plaintiff's symptoms, both psychiatric and physical, support the ALJ's credibility finding.

## 4. PRECIPITATING AND AGGRAVATING FACTORS

The medical records support the conclusion that plaintiff's depression and anxiety are triggered or aggravated by situational problems (e.g., plaintiff's divorce from an abusive spouse, anxiety over plaintiff's disability claim, problems getting her prescribed medication). Dr. Menendez, a treating physician for plaintiff's depression and anxiety, noted that her symptoms were "triggered by external sources" (Tr. 482).

The medical records show one entry where plaintiff complained to a treating doctor about an aggravating factor: on February 1, 2005, plaintiff stated that her pain was increased with activity (Tr. 373), to which Dr. Baade responded that she should engage in a "walking program" to lose weight and get in shape (Tr. 374). The medical records also contain an entry for May 17, 2005, when plaintiff reported to the emergency room complaining of back spasms and stated that her pain worsened with movement (Tr. 554). Two days later, a treating physician at a clinic assessed plaintiff as morbidly obese and encouraged her to lose weight (Tr. 545).

This factor supports the ALJ's credibility finding.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Plaintiff testified at the April 2, 2007, administrative hearing that her medications make her tired and put her to sleep without her realizing it (Tr. 659). However, there are no contemporaneous entries in the medical records corroborating plaintiff's complaint at the hearing.

On the contrary, the entries in the medical records support the conclusion that plaintiff's various medications, although changed and adjusted from time to time, are essentially effective and without significant side effects (Tr. 210, 245, 475, 479, 481, 491, 492, 493, 494, 598, 602, 608).

## 6. FUNCTIONAL RESTRICTIONS

The ALJ stated in her decision:

> The plaintiff's residual functional capacity is as propounded in the hypothetical question to the vocational expert at the hearing as follows: the plaintiff can perform light work, including lifting and carry up to 20 pounds occasionally and 10 pounds frequently. Plaintiff can occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. Plaintiff should not work at unprotected heights. Regarding her mental limitations, the plaintiff can perform simple, routine work, but must avoid work involving high production quotas. Plaintiff is moderately limited in her ability to interact with the general public, with "moderately" meaning she has some difficulty but can still function satisfactorily.

(Tr. 23-24.)

### a. Contemporaneous Medical Records

There are two entries in the medical records reflecting functional restrictions for plaintiff: (1) an entry for May 17, 2005, when plaintiff went to an emergency room complaining about back spasms (Tr. 554-557) and the emergency room doctor limited her lifting, pushing, or pulling to no more than 10 pounds for a period of five days (Tr. 555); and (2) an entry for August 28, 2006, by Dr. Menendez plaintiff's treating psychiatrist, when the doctor assigned plaintiff a GAF of 58, reflecting moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 518).

### b. Psychological Assessments, Evaluations, and Questionnaires

Concerning the plaintiff's psychological restrictions, the following assessments, evaluations,

and questionnaires appear in the administrative record:

- On September 22, 2003, Nora Clark, Ph.D., examined plaintiff and concluded that she could "perform most work-related functions in an ordinary work setting without difficulty" (Tr. 226). Plaintiff could understand and remember instructions, maintain concentration and persistence in tasks, and interact socially (Tr. 226).

- On October 4, 2003, Dr. Singh wrote a letter concerning a September 29, 2003, consultative examination of plaintiff (Tr. 220-223). The doctor's psychiatric examination of plaintiff revealed normal mood, memory, and judgment (Tr. 221).

- On August 9, 2004, Nora Clark, Ph.D., did a second evaluation of plaintiff for the agency (Tr. 320-322). Dr. Clark concluded that plaintiff "would be able to perform most work-related functions in an ordinary work setting without difficulty" (Tr. 321). The doctor also observed that plaintiff's anxiety and intrusive memories of abuse might be expected to interfere at times with her ability to stay on task (Tr. 321).

- On August 19, 2004, Dr. Menendez completed a psychiatric impairment questionnaire (Tr. 344-351). The doctor assessed plaintiff with a Global Assessment of Functioning (GAF) score of 54[7] (Tr. 344). The doctor further concluded that plaintiff was markedly limited in 12 of 20 categories of mental functioning (Tr. 347-349).

The ALJ declined to rely on the opinions of Dr. Menendez writing:

No weight is given to the questionnaire Dr. Menendez completed on August 16, 2004. Not only is it inconsistent with the findings Dr. Nora Clark made in the same month, it is, as Dr. Goren noted, inconsistent with his own records and assessments, which reflect a patient with moderate (with GAF scores ranging from 51 to 60), not marked, impairments.

(Tr. 18-19). From my review of the record on appeal, the ALJ did not err by refusing to rely on Dr.

Menendez's questionnaire.

---

[7]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

**c. Physical Assessments, Evaluations, and Questionnaires**

Concerning plaintiff's physical restrictions, the following assessments, evaluations, and questionnaires appear in the administrative record:

- On October 4, 2003, Dr. Singh wrote a letter regarding a September 29, evaluation of plaintiff (Tr. 220-223). Dr. Singh observed that plaintiff had normal gait and "handled objects well" (Tr. 221). Plaintiff was able to get on and off the examination table without difficulty (Tr. 221). Plaintiff had "good" upper extremity strength and almost full range of motion in her knees (Tr. 234). The doctor assessed plaintiff with hypertension (uncontrolled), bipolar depression (stable), chronic bronchitis, and degenerative joint disease involving multiple joints with spurs in both heels (Tr. 221).

- On August 25, 2004, Dr. Cathcart evaluated plaintiff (Tr. 333-335) and reported that she walked without any assistance and was able to move from the chair to the examination table without difficulty (Tr. 334); had full range of motion in her shoulders, elbows, wrists, hands, hips, knees, and ankles (Tr. 334); had normal strength and grip (Tr. 334); and while she had "some low back tenderness," plaintiff had full range of motion (Tr. 334). Dr. Cathcart concluded that plaintiff's back and leg pain were due to obesity and osteoarthritis (Tr. 335). He believed that these impairments "[did] not appear to be barriers to [her] return to work" (Tr. 335) and concluded that plaintiff could lift 25 pounds occasionally and 10 pounds frequently, sit for six hours in an eight-hour workday, and stand and walk for six hours in an eight-hour workday (Tr. 334). The doctor also concluded that plaintiff should be restricted from (1) balancing at unprotected heights and (2) more than occasional stooping, kneeling, crouching, and crawling (Tr. 334).

- On September 9, 2004, Dr. Sandberg opined that plaintiff was able to sit one hour total and stand/walk up to one hour in an eight-hour workday (Tr. 338). The doctor concluded that plaintiff could lift 10 pounds frequently and 20 pounds occasionally; had moderate limitations in grasping, turning, twisting objects; using fingers and hands for fine manipulations; and using arms for reaching including overhead (Tr. 339-340), and indicated by checkmarks both that plaintiff's symptoms would likely increase if she were placed in a competitive work environment and that her symptoms would interfere with her ability to keep her neck in a constant position (Tr. 340). The doctor opined that plaintiff's pain, fatigue, or other symptoms were frequently severe enough to interfere with her attention and concentration (Tr. 341). It was also noted that plaintiff suffered from depression that contributed to her symptoms and functional limitations, but that she was capable of handling low stress. Dr. Sandberg estimated that plaintiff needed to take unscheduled breaks at unpredictable intervals during an eight-hour workday, seven to eight times for 10 to 15 minutes each (Tr. 341). Other limitations that affected plaintiff's ability to work at a regular job on a sustained basis

45

were a need to avoid temperature extremes, and no pulling, kneeling, bending, or stooping (Tr. 342).

- On December 15, Dr. Kumar concluded in a lumbar spine impairment questionnaire that plaintiff is permanently disabled for any eight-hour a day work (Tr. 392). In another lumbar questionnaire, Dr. Kumar stated that plaintiff could lift five pounds occasionally, sit for two hours in an eight-hour workday, and stand and walk for one hour in an eight-hour workday (Tr. 388-89). Dr. Kumar concluded by stating that plaintiff is permanently disabled for any type of eight-hour work (Tr. 392).

The ALJ declined to rely on the opinions of Dr. Sandberg and Dr. Kumar. As to Dr. Sandberg's questionnaire, the ALJ wrote:

> Not only is Dr. Sandberg's functional assessment widely inconsistent with the findings and assessment made by Dr. Cathcart in the previous month, his assessment, as pointed out by the medical expert, is not supported by his own examinations. From a physical standpoint in 2004, the claimant had two impairments that caused limitations - obesity and early degenerative disc disease of the lumbar spine. Those impairments did not limit the claimant to sitting/standing/walking two hours or less in an 8-hour day. Because there is no sound basis for his conclusions, Dr. Sandberg's questionnaire is given no weight.

(Tr. 17.) From my review of the medical records, I find no error by the ALJ in discounting the opinions of Dr. Sandberg.

Concerning Dr. Kumar, the ALJ wrote:

> Dr. Kumar's expressed view that the claimant is disabled and cannot perform even at a sedentary level is given no weight. As reported by the medical expert, his examination does not support the extreme limitations assessed. Moreover, Dr. Baade's examinations during the same time frame are essentially normal and undermine the opinions of Dr. Kumar.

(Tr. 18.) Again, I see no error in the ALJ's decision not to rely on the opinions of Dr. Kumar.

At the April 2, 2007, administrative hearing, plaintiff testified that she was unsure whether she could work at a job that did not require heavy lifting, but she would "give it a try" (Tr. 656).

## B. CREDIBILITY CONCLUSION

Based on my review of the administrative record, the ALJ did not err by discounting plaintiff's subjective complaints of disabling symptoms. Plaintiff's allegations of total disability are not supported by her work record, her daily activities, the symptoms accompanying her mental and physical impairments, the precipitating and aggravating factors relating to her conditions, the effectiveness of her medication, or her functional capacity.

## VII. TREATING PHYSICIANS' OPINIONS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of Dr. Sandberg; Dr. Kumar; and Dr. Menendez.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

As to Dr. Sandberg, plaintiff's treating doctor for physical complaints, the ALJ rejected his opinion about plaintiff's alleged disability principally because it was not corroborated by his contemporaneous treatment records (Tr. 17). My review of the medical records confirms this

conclusion. Dr. Sandberg's contemporaneous records show plaintiff's back problems did not require any additional attention until December 9, 2004, when Dr. Sandberg referred plaintiff to a pain clinic (Tr. 548); and while under the care of Dr. Baade at the pain clinic, plaintiff's back problems were treated conservatively through exercise, recommended weight loss, medication, and injections; and plaintiff's back problems largely improved (Tr. 374, 450-451, 454, 598, 608). The medical records simply do not support Dr. Sandberg's opinion that plaintiff is physically disabled.

> Concerning Dr. Kumar the ALJ rejected the opinions for the following reasons:
>
> On November 23, 2005, Dr. Kumar, a consulting physiatrist, conducted an EMG study at the request of Dr. Sandberg. (14F/10-12) He noted that the claimant was 5'3" tall and weighed 310 pounds. Her gait was normal. The EMG showed bilateral L5 lumbar radiculopathy. Dr. Kumar assessed chronic lumbar back pain secondary to degenerative disc disease and morbid obesity. He opined that she was "definitely disabled," that she could at most perform less than sedentary work and that she could not sit/stand/walk for more than 3 hours in an 8-hour day. (14F/1-9) Dr. Kumar's expressed view that the claimant is disabled and cannot perform even at a sedentary level is given no weight. As reported by the medical expert, his examination does not support the extreme limitations assessed. Moreover, Dr. Baade's examinations during the same time frame are essentially normal and undermine the opinions of Dr. Kumar.

(Tr. 18.)

The record does not reflect that Dr. Kumar was plaintiff's treating neurologist. A "treating source" is defined as a "physician, psychologist, or other acceptable medical source" who provided the claimant with medical treatment or evaluation on an ongoing basis. 20 C.F.R. §§ 404.1502 and 416.902; Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006).

The record shows that Dr. Kumar examined plaintiff once on November 23, 2005 (Tr. 395-937). The resulting report reads, at least in part, as though it were prepared for litigation when the doctor concludes:

She is definitely disabled for any gainful employment and should not be doing any bending, stooping, lifting or prolonged sitting or standing. She is not fit to return to any type of gainful employment in the foreseeable future.

(Tr. 396).

There is no evidence that the doctor ever treated plaintiff or evaluated her condition again. Therefore, Dr. Kumar's opinion is not entitled to controlling weight.

Concerning Dr. Menendez, plaintiff's treating psychiatrist, the ALJ rejected his opinions, in part, because they were not corroborated by his contemporaneous medical records (Tr. 19). Dr. Menendez's records are brief summaries accompanied by checkmarks to memorialize his regular, 15-minute meetings with plaintiff to review her medications. The entries do not support the doctor's description of plaintiff's mental health problems as creating marked limitations. For example, Dr. Menendez's GAF scores throughout plaintiff's care show moderate, not marked limitations. Most of the entries are positive when describing plaintiff's response to medication and treatment. For example, on December 6, 2005, plaintiff was in a "good mood" (Tr. 477); on May 23, 2006, plaintiff was sleeping well with medication (Tr. 475); on January 11, 2007, plaintiff's depression and anxiety had "lessened" (Tr. 512); on January 25, 2007, plaintiff's depression and anxiety were "much decreased" (Tr. 511); on July 31, 2007, plaintiff had an improving mood and decreased anxiety (Tr. 590); and on December 27, 2007, plaintiff was "stable" (Tr. 586). This is not to suggest that the records do not contain negative entries, because they do, but the majority of the doctor's notes describe plaintiff's depression and anxiety as stable and being controlled by the medication. They do not describe marked limitations in her functioning.

Based on my review of Dr. Menendez's medical records, the ALJ did not err by refusing to defer to his opinions in the questionnaire.

## VIII. VOCATIONAL EXPERT'S OPINIONS

Plaintiff complains that the ALJ failed to discuss the vocational expert's testimony that no jobs would be available for a person who needed to miss two days of work per month or take breaks totaling one hour per day. Plaintiff claims that these limitations are supported by the opinions of Dr. Sandberg, Dr. Menendez, and Dr. Kumar.

As discussed in the earlier section dealing with the opinions of plaintiff's treating physicians, the ALJ properly discredited those opinions. The ALJ is not required to rely on a vocational expert's testimony that includes discredited opinions. The ALJ may rely on a hypothetical when it is supported by substantial evidence in the record and is accepted as true. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

The ALJ posed a hypothetical question to the vocational expert, assuming an individual who could perform light work except that she could only occasionally stoop, crouch, crawl, and kneel and could not climb ladders, ropes, or scaffolds or work at unprotected heights (Tr. 662). The ALJ further limited the hypothetical person to only simple, routine work with no high-production quotas and minimal public interaction (Tr. 662-63). The vocational expert testified that such an individual would be able to perform the light, unskilled work of photocopy-machine operator, microfilm processor, and collator operator (Tr. 663).

In her decision, the ALJ found that plaintiff had the residual functional capacity to perform light work except that she could occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs; could not climb ladders, ropes or scaffolds; and could not work at unprotected heights (Tr. 22). The ALJ further limited plaintiff to simple, routine work with no high production quotas and only minimal interaction with the general public (Tr. 22). There is no error here.

## IX.  CONCLUSIONS

The ALJ properly evaluated plaintiff's credibility, properly discredited the opinions offered by plaintiff's treating physicians, and properly relied on testimony from the vocational expert that excluded the discredited opinions of plaintiff's treating physicians. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

  /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 31, 2011